Case No. 21-CV-598 JLS (WVG)

MATTHEW LOTZE, et al.  v TOTAL LENDER SOLUTIONS, INC..

# EXHIBITS TO FIRST AMENDED COMPLAINT

# Numbers 1f-2

Complaint for MATTHEW LOTZE and LAURA OHMAN

1   **See, Exhibit 1-f, "Personal Guaranty, dated April 12, 2018"**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for MATTHEW LOTZE and LAURA OHMAN

**Royal Development, Inc.**
**200 South Virginia Street, Suite 500, Reno, NV 89501**

Date:     **4/12/2018**

File:     **18-5078**

# PERSONAL GUARANTY

FOR VALUABLE CONSIDERATION, receipt of which by the undersigned has acknowledged, and which is evidenced by various documents, including as applicable, a Promissory Note Secured by Deed of Trust ("Note") in the face amount of **$1,500,000.00**, a Deed of Trust, and Absolute Assignment of Rents (all of even date herewith, and all jointly, and as applicable, severally, referred to as the "Loan Documents"); and to induce **Allrise Real Estate Credit Fund, LP, as to an undivided 100.000% interest,** ("Lender") to make the loan ("Loan") described in the Loan Documents to or for the account of **Filipino Flash, LLC 2550 East Desert Inn Road, #188, Las Vegas, NV 89121** ("Borrower").

A.  The Loan will be evidenced by a Promissory Note (the "Note") dated **4/12/2018,** and shall be secured by a Deed of Trust with Assignment of Rents (the "Deed of Trust") encumbering Borrower's interest in the real property described therein (the "Property").

B.  Lender is unwilling to make the Loan based solely on the security offered by Borrower and Borrower's own creditworthiness, unless individuals with a creditworthiness comparable to that of Guarantor guaranty the Loan in accordance with the terms and conditions set forth below

C.  Guarantor has agreed to execute this Guaranty in order to guarantee to Lender repayment of the Loan pursuant to the terms of the Note and each Guarantor acknowledges that he or she is undertaking an independent obligation separate from that of Borrower to repay the Loan as provided below.

**NOW, THEREFORE, in consideration of Lender's making the Loan and for other good and valuable consideration, Guarantor jointly, severally and unconditionally guarantees and agrees as follows:**

1. Guaranty.  Guarantor unconditionally guarantees and promises to pay to Lender or order, on demand, in lawful money of the United States, all amounts due Under the Note (together with interest thereon and any and all other amounts which may become due pursuant to all the terms and conditions of the Note), and any amount advanced, disbursed, or which may become due pursuant to the Deed of Trust.

Guarantor agrees and acknowledges that this Guaranty is a guarantee of payment and performance and not of collection. Guarantor's obligations under this Guaranty are irrevocable so long as any portion of the Loan remains unpaid.

2. Independent Obligation.  Guarantor agrees that this Guaranty is separate, independent of, and in addition to, the obligations and undertakings of Borrower pursuant to the Note and Deed of Trust. Guarantor further agrees that a separate action or actions may be brought and prosecuted against Guarantor hereon whether or not action is brought against Borrower or whether or not Borrower be joined in any such action or actions and independent of any action at law or proceeding under the power of sale provision in the Deed of Trust. Guarantor waives the benefit of any statute of limitations affecting the liability of Guarantor hereunder or the enforcement hereof, and agrees that any repayment of the loan or any part thereof or other act, which shall toll any statute of limitations applicable thereto shall similarly operate to toll such statute of limitations  applicable to Guarantor's liability hereunder.

3. Authority of Lender. Guarantor authorizes Lender, without notice or demand, and without affecting the liability of Guarantor hereunder, from time to time to:

(a) Renew, extend, accelerate or otherwise change the terms of the Loan as set forth in the Note, or otherwise change the rate of interest thereon; or

(b) Release or substitute anyone or more of the endorsers of the Note or anyone or more Guarantor. Lender, without notice, may assign this Guaranty in whole or in part.

4. Waivers.

(a) Guarantor waives all right to require Lender to:

(1) Proceed against Borrower;

(2) Proceed against or exhaust any security held from Borrower; or

(3) Pursue any other remedy in Lender's power.

Guarantor waives all defenses arising by reason of any disability or other defense of Borrower, including, without limitation, all defenses" if any, arising from the filing of a petition in bankruptcy by or against Borrower, or by reason of the cessation of the liability of any Borrower from any cause other than full repayment of the Loan. Guarantor waives all defenses which may be acquired by reason of Lender's election of any remedy against Guarantor or Borrower or both, including, but without limitation, an election by Lender to exercise its rights under the power of sale set forth in the Deed of Trust and the consequent loss by Guarantor of the right to recover any deficiency from Borrower. Without limiting the generality of the foregoing Guarantor expressly waives any and all benefits under California Civil Code Sections 2809, 2810, 2819, 2839, 2845, 2847, 2848,2849, 2850,2855, 2899 and 3433 and California Code of Civil Procedure Sections 580a, 580b, 580d and 726. Until the Loan shall have been repaid in full, Guarantor shall have no right of subrogation, and waives all right to enforce any remedy; which Lender now has or may hereafter have against Borrower, and waives all benefit of and all right to participate in any security now or hereafter held by Lender. Guarantor waives all presentments, demands for performance, notice of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of this Guaranty.

(b) In addition, Guarantor waives any duty on the part of Lender to disclose to Guarantor any facts it may now or hereafter know about Borrower, regardless of whether Lender:

(1) Has reason to believe that any such facts materially increase the risk beyond that which Guarantor intends to assume; or

(2) Has reason to believe that such facts are unknown to Guarantor; or

(3) Has a reasonable opportunity to communicate such facts to Guarantor; it being understood and agreed that Guarantor is fully responsible for being and keeping informed of the financial condition of Borrower and of all circumstances bearing on the risk of nonpayment of any indebtedness hereby guaranteed.

5. Subordination. All indebtedness of Borrower now or hereafter held by Guarantor is subordinated to the Loan, and all indebtedness of Borrower to Guarantor, if Lender so requests, shall be collected, enforced and received by Guarantor as trustee for Lender and shall be paid over to Lender on account of the Loan but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty; provided, however, that so long as no default by Borrower shall occur under the Loan, any indebtedness of Borrower to Guarantor, incurred in the ordinary course of business which will not in the Judgment of Lender cause a default of Borrower's obligations under the Note, or unreasonably impair Borrower's ability to repay the Note, may be repaid in accordance with the terms of such indebtedness.

6. Attorneys' Fees. Guarantor agrees to pay attorneys' fees and all other costs and expenses, which may be incurred by

Lender in the enforcement of this Guaranty and in the repayment of the Loan guaranteed hereunder.

7. Warranties. Guarantor warrants that:

(a) Any financial statements of Guarantor previously furnished to Lender to induce Lender to make the Loan are correct. Guarantor has title to all assets shown in such statements and there has been no material adverse change in the financial condition of Guarantor since the date of the last statement furnished.

(b) There are no actions, suits or proceedings pending, or, so far as Guarantor is aware, threatened against Guarantor which might result in any material adverse change in the financial condition of Guarantor.

(c) Neither the execution nor delivery of this Guaranty, nor compliance with the terms hereof, will conflict with or result in the breach of any law or statute, will constitute a breach or default under any agreement or Instrument to which Guarantor may be a party, or will result in the creation or imposition of any charge or lien upon any property or assets of Guarantor.

8. Remedies. If Guarantor shall fail to perform or otherwise breach any of its obligations hereunder, in addition to all other rights and remedies Lender may have at law or in equity, Lender may, from time to time, and without first requiring performance on the part of Borrower, and without being required to exhaust or proceed against any or all security held by Lender, look to and require performance by Guarantor of any obligation on the part of Guarantor to be performed pursuant to the terms of this Guaranty by action at law or in equity or both. Lender may also collect from Guarantor in any such action compensation for and Guarantor hereby indemnifies and holds Lender harmless from, all loss, cost, damage, injury and expense sustained or incurred by Lender proximately caused by or resulting from Guarantor's breach of or failure to perform any of its obligations under this Agreement.

9. Does Not Supersede Other Guaranties. The obligations of each Guarantor hereunder shall be separate and in addition to the obligations of each other Guarantor hereunder, and this Guaranty shall not affect or invalidate any such other guaranties.

The liability of Guarantor to Lender shall at all times be deemed to be the aggregate liability of Guarantor under the term of this Guaranty and of any other guaranties previously or hereafter given by Guarantor and not expressly revoked, modified or invalidated.

10. No Waiver. No failure by Lender to pursue any remedy hereunder, under the Deed of Trust or under any other document relating to the Loan shall constitute a waiver on the part of Lender of its right to pursue such remedy on the basis of the same or a subsequent breach. No extension, modification, amendment or renewal of the Note, the Deed of Trust or any other security instrument securing the Loan, shall serve to waive in whole or in part the provisions hereof for discharge Guarantor from any of its obligations set forth herein, except to the extent expressly acknowledged by Lender in writing, and any such action may be taken by Lender with or without the consent of Guarantor.

11. Miscellaneous.

a. All married persons who sign this Guaranty hereby expressly agree that recourse may be had against his or her separate property for all obligations under this Guaranty.

b. In all cases where there is more than lone Borrower named herein, or when this Guaranty is executed by more than one Guarantor, the word "Borrower" and the word "Guarantor," respectively, shall mean all and anyone or more of them.

c. This Guaranty shall be construed in accordance with the laws of the State of California.

d. The obligations and promises set forth herein shall be the joint and several undertakings of each of the persons

executing this Guaranty, Guarantor, and Lender may proceed hereunder against anyone or more of said persons without waiving the right to proceed against any of the others.

e. Time is of the essence hereof.

f. In the event that any provision of this guaranty shall be held to be invalid, the same shall not affect the validity of the remainder of this Guaranty.

g. No amendment, modification, termination or waiver of any provision of this Guaranty shall be effective for any purpose whatsoever, unless such amendment, modification, termination or waiver is in writing and signed by Lender.

h. The article and section headings in this Agreement are for assistance in identification only and are not to be considered part of the substance of the provisions of this Agreement.

THE UNDERSIGNED WAIVES THE RIGHT TO TRIAL BY JURY IN ANY AND EVERY ACTION OR PROCEEDING OF ANY KIND OR NATURE UNDER OR BY REASON OF OR RELATING IN ANY WAY TO THIS GUARANTY, THE LOAN DOCUMENTS OR ANY OF THE MATTERS AND THINGS REFERRED TO HEREIN.

IN WITNESS WHEREOF, each undersigned Guarantor has executed this Guaranty as of the date first set forth above.

| | 4/12/18 | | | 4/12/18 |
|---|---|---|---|---|
| Guarantor Rachel Ann Marcial Donaire | Date | Guarantor Nonito Gonzalez Donaire Jr. | | Date |

Royal Development, Inc.
200 South Virginia Street, Suite 500, Reno, NV 89501

Date:    4/12/2018
To:    Filipino Flash, LLC

## CERTIFICATE OF BUSINESS PURPOSE OF LOAN

Borrower certifies to Royal Development, Inc. ("Originator") as follows:

1. I have applied to Originator for a trust deed loan of **$1,500,000.00** secured by real property.

2. Originator has stressed to me the importance of knowing the primary purpose of the Loan. I know that the legal responsibilities of Originator vary considerably depending upon whether the Loan is a consumer loan (for personal, household or family purposes), or a business loan.

3. I have represented to Originator and again represent that the purpose(s) of The Loan, exclusive of commissions and loan expenses incurred to obtain the Loan are as follows:

Amount:$_____
Purpose:

4. The primary beneficiary of The Loan funds: _____

that is in the business of doing: _____

5. No part of the Loan proceeds are intended to be used for a non-business (i.e., consumer) purpose except:

Amount:$_____
Purpose:

The lender, broker, assignees and successors of the Originator rely upon this certificate. I declare under penalty of perjury under the laws of the State of California that the foregoing Certificate is true and correct.

| Borrower | Filipino Flash, LLC a Limited Liability Company By: Rachel Ann Marcial Donaire, Member | Date 4/12/18 | Borrower | Filipino Flash, LLC, a Limited Liability Company By: Nonito Gonzalez Donaire Jr., Member | Date 4/12/18 |

# ARBITRATION AGREEMENT

*MUTUAL AGREEMENT TO ARBITRATE DISPUTES:* Borrower has or will obtain a mortgage loan (the "Loan") made or arranged by the undersigned company (the "Company"). Borrower, Company and any lender making the Loan (collectively, the "Lender") agree that any Dispute involving the Loan, including, but not limited to claims arising from the origination, documentation, disclosure, servicing, collection or any other aspect of the Loan transaction or the coverage or enforceability of this Agreement, shall be resolved exclusively by binding arbitration under the terms of this Agreement. This Agreement shall also be binding on the agents, successors and assigns of the parties and the Loan.

"Dispute" shall include, but not be limited, to:

1. Any claimed wrongdoing, such as misrepresentation, negligence, breach of contract, breach of fiduciary duty, unconscionability, fraud in the inducement, rescission, breach of the covenant of good faith and fair dealing and unfair business practices.

2. Any claimed violation of state or federal laws, including, but not limited to consumer credit, truth-in-lending, civil rights, equal opportunity, real estate settlement, housing discrimination laws, fair lending acts, licensing, loan regulation and unfair business practices acts.

"Dispute" shall not include:

1. Actions by the lender to judicially or non-judicially foreclose on the note and deed of trust (or mortgage) for the Loan, to enjoin waste, to collect rents, interpleader actions or actions for a receiver, to recover possession, ejectment or relief from the automatic stay in bankruptcy, or to obtain relief through governmental agencies.

2. Actions for provisional remedies such as a temporary restraining order or preliminary injunction or for a permanent injunction based upon an arbitration award.

*ARBITRATION OF DISPUTES:* Arbitration shall be conducted under the rules of the American Arbitration Association ("AAA"). Arbitration shall be filed at the office of the AAA nearest to the real property securing the Loan. Reasonable discovery shall be permitted pursuant to a written discovery plan determined by the arbitrator(s). Company shall pay all arbitrator fees and hearing fees to the extent they exceed what Borrower would have had to pay if the matter were tried in court. Each party shall bear their own attorneys fees, unless a specific claims statute applies. The arbitrator(s) shall render a statement of the reasons for the award. Judgment on the award may be entered in any court of competent jurisdiction.

*WAIVERS:*
THE PARTIES HEREBY FREELY WAIVE THE RIGHT TO TRIAL BY JUDGE OR JURY, THE RIGHT TO APPEAL, FULL PRETRIAL DISCOVERY AND APPLICATION OF THE RULES OF EVIDENCE.

**We have read, fully understand and agree to the above:**

BORROWER:

| | |
|---|---|
| Borrower — Filipino Flash, LLC a Limited Liability Company By: Rachel Ann Marcial Donaire, Member — Date 4/12/18 | Borrower — Filipino Flash, LLC, a Limited Liability Company By: Nonito Gonzalez Donaire Jr., Member — Date 4/12/18 |

COMPANY: American Pacific Mortgage

By _____

                                          Title                          Date

LENDER(S):

Lender    AltRise Real Estate Credit Fund, LP    Date        Lender                                Date

**Exhibit 1-g, "Collateral Security Agreement, dated**

Complaint for MATTHEW LOTZE and LAURA OHMAN

## COLLATERAL SECURITY AGREEMENT

THIS COLLATERAL SECURITY AGREEMENT (the "Security Agreement") is entered into as of April 12, 2018, by and between FilipinoFlash, LLC, a Nevada limited liability company ("Debtor" or "Borrower"); and Allrise Real Estate Credit Fund, LP ("Secured Party" and "Lender").

### RECITALS

A.      Borrower has borrowed funds from Lender pursuant to a One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00) Note dated April 12, 2018 (the "Note") which is secured by a Deed of Trust dated April 12, 2018 (the "Security Instrument"). The loan ("Loan") is evidenced by the Note, Security Instrument, and all attendant loan documents (collectively the "Loan Documents") executed by Borrower and all other parties affiliated with the Loan.

B.      As security for its repayment obligations under the Note, Debtor agreed to grant Secured Party a security interest in all of its assets on the terms set forth in this Security Agreement. Due to the mutual mistake of Debtor and Secured Party, this Security Agreement was not included at the origination of the Loan. Upon discovery of the mutual mistake, Debtor and Secured Party wish to enter into this Security Agreement.

C.      Capitalized terms not otherwise defined shall have their respective meanings as defined in the Security Instrument or Note.

NOW, THEREFORE, to that end and in consideration of the premises, covenants and agreements set forth below, and the mutual benefits to be derived from this Security Agreement, and other good and valuable consideration, the parties hereto agree as follows:

1.      **SECURITY INTEREST.** To secure the Obligation, Debtor hereby transfers, conveys, assigns, and grants to Secured Party a security interest in all of Debtor's assets, which may include the following items (hereinafter, collectively, the "Collateral"):

(a) GENERAL INTANGIBLES. All of Debtor's General Intangibles, now existing or hereafter arising or acquired, together with the proceeds therefrom. As used herein, the term "General Intangibles" means all personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money, and includes, but is not limited to, business records, deposit accounts, inventions, intellectual property, designs, patents, patent applications, trademarks, trademark applications, trademark registrations, service marks, service mark applications, service mark registrations, trade names, goodwill, technology, knowhow, confidential information, trade secrets, customer lists, supplier lists, copyrights, copyright applications, copyright registrations, licenses, permits, franchises, tax refund claims, and any letters of credit, guarantee claims, security interests, or other security held by the Debtor to secure any "Accounts" (as hereinafter defined).

(b) ACCOUNTS (INCLUDING ACCOUNTS RECEIVABLE). All of Debtor's Accounts, whether now existing or hereafter arising or acquired, together with the proceeds therefrom. As used herein, the term "Accounts" means any right of Debtor to receive payment from another person or entity, including payment for goods sold or leased, or for services rendered, no matter how evidenced or arising, and regardless of whether yet earned by performance, including, without limitation, any and all bank accounts, ACH accounts, and accounts related to credit card processing. It includes, but is not limited to, accounts, accounts receivable, contract rights, contracts receivable, purchase orders, notes, drafts, acceptances, all rights to payment earned or unearned under a charter or other contract involving the use or

© 2007 Geraci Law Firm; All Rights Reserved.
Collateral Security Agreement

hire of a vessel and all rights incident to the charter or contract, and other forms of obligations and receivables.

(c) INVENTORY. All of Debtor's Inventory, whether now owned or hereafter acquired, together with the products and proceeds therefrom and all packaging, manuals, and instructions related thereto. As used herein, the term "Inventory" means all goods, merchandise, and personal property held for sale or leased or furnished or to be furnished under contracts of service, and all raw materials, work in process, or materials used or consumed in Debtor's business, wherever located and whether in the possession of Debtor, a warehouseman, a bailee, or any other person.

(d) EQUIPMENT. All of Debtor's Equipment, now owned or hereafter acquired, together with the products and proceeds therefrom, and all substitutes and replacements therefor. As used herein, the term "Equipment" includes all equipment, machinery, tools, office equipment, supplies, furnishings, furniture, or other items used or useful, directly or indirectly, in Debtor's business, all accessions, attachments, and other additions thereto, all parts used in connection therewith, all packaging, manuals, and instructions related thereto, and all leasehold or equitable interests therein.

(e) FIXTURES. All of Debtor's interest in and to all fixtures and furnishings, now owned or hereafter acquired, together with the products and proceeds therefrom, all substitutes and replacements therefor, all accessories, attachments, and other additions thereto, all tools, parts, and supplies used in connection therewith, and all packaging, manuals, and instructions related thereto, located on or attached to all of Debtor's business premises as well as every other location of Debtor's business, including but not limited to all fixtures located at 3730 Topaz Street, Las Vegas, Nevada 89121 ("Property").

(f) CHATTEL PAPER, DOCUMENTS AND INSTRUMENTS. All of Debtor's right, title, and interest in any chattel paper, documents, or instruments, now owned or hereafter acquired or arising, or now or hereafter coming into the possession, control, or custody of either Debtor or Secured Party, together with all proceeds therefrom. The terms "chattel paper," "documents," and "instruments" shall have those meanings ascribed to them in the Nevada Uniform Commercial Code.

(g) OTHER ASSETS. All of Debtor's right, title, and interest in all business assets now owned or hereafter acquired by Debtor, including all assets located at the business premises, and those assets described in the Exhibit "A" attached hereto and incorporated herein.

2. OBLIGATION. This security interest is given as security for all indebtedness and obligations owed by Borrower to Secured Party.

3. PROCEEDS. As used in this Security Agreement, the term "proceeds" means all products of the Collateral and all additions and accessions to, replacements of, insurance or condemnation proceeds of, and documents covering any of the Collateral, all property received wholly or partly in trade or exchange for any of the Collateral, all leases of any of the Collateral, and all rents, revenues, issues, profits, and proceeds arising from the sale, lease, license, encumbrance, collection, or any other temporary or permanent disposition, of any of the Collateral or any interest therein.

4.       TITLE; FILING. Debtor warrants that, except as previously disclosed in writing to Secured Party, it is the owner of the Collateral free and clear of all liens, claims, and encumbrances of whatever kind or nature. Debtor covenants that so long as any portion of the Obligation remains unpaid, Debtor will not execute or file a financing statement or security agreement covering the Collateral to anyone other than Secured Party, except in the ordinary course of business or as otherwise allowed. Debtor agrees to sign and deliver one or more financing statements or supplements thereto or other instruments as Secured Party may from time to time require to comply with the Uniform Commercial Code or other applicable law

to preserve, protect and enforce the security interest of Secured Party and to pay all costs of filing such statements or instruments. In addition, Secured Party shall promptly file a financing statement to perfect Secured Party's interest in the Collateral.

     5.     **CARE OF COLLATERAL.** Debtor will keep in effect all licenses, permits and franchises required by law or contract relating to Debtor's business (if applicable), property, or the Collateral; maintain insurance on the Collateral; keep the Collateral in good repair and be responsible for any loss or damage to it; at all times warrant and defend Debtor's ownership and possession of the Collateral keep the Collateral free from all liens, claims, encumbrances and security interests; pay when due all taxes, license fees, and other charges upon the Collateral or upon Debtor's business, property or the income therefrom; and not misuse, conceal or in any way use or dispose of the Collateral unlawfully or contrary to the provisions of this Security Agreement or of any insurance coverage. Provided however, Debtor is allowed to use and/or dispose of the Collateral in the ordinary course of business and/or consistent with past practice. Loss of, damage to, or uncollectability of the Collateral or any part thereof will not release Debtor from any of its obligations hereunder.

     6.     **DEFAULT.** A default hereunder will occur if any of the following events occur: (1) Borrower fails to pay any portion of the Obligation when due; (2) Borrower or Debtor fails to perform any undertaking or materially breaches any warranty or covenant in this Security Agreement or the Note; (3) any statement, representation or warranty of Debtor and Borrower under this Security Agreement or the Note is untrue in any material respect when made; (4) Borrower or Debtor become insolvent or unable to pay debts as they mature or makes an assignment for the benefit of creditors or any proceeding is instituted by or against it alleging that it is insolvent or unable to pay its debts as they mature; (5) dissolution of Borrower or Debtor; (6) an attachment, garnishment, execution or other process is issued or a lien filed against any property of Debtor or property of Borrower that secures the Loan, which is not removed within a reasonable period of time; (7) Debtor transfers an interest in any of the Collateral contrary to the provisions of this Security Agreement without the prior written consent of Secured Party other than in the ordinary course of business; and (8) any attempt to secure accounts of Debtor by a lender other than Lender.

     7.     **REMEDIES.** Upon the occurrence of any default hereunder at any time thereafter, all of the Obligation will, at the election of Secured Party and without notice of such election, or demand for payment, become immediately due and payable and Secured Party will have the remedies of a secured party under applicable law. In addition, Lender shall have the following specific remedies:

     a.     Power of Sale. Lender shall have the full power to sell, lease, transfer or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Debtor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Debtor, and other persons as required by law, reasonable notice of the time and place of public sale, or the time after which any private sale or other disposition of the Collateral is to be made. However, no notice need to be provided to any person who, after an Event of Default occurs, enter into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

     b.     Appoint Receiver. Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Obligations. The receiver may serve

© 2007 Geraci Law Firm; All Rights Reserved.
Collateral Security Agreement

3

without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Obligations by a substantial amount. Employment by Lender shall not disqualify a person from serving as receiver.

     c.    Election of Remedies. Except as may be prohibited by law, all of Lender's rights and remedies, whether evidenced by this Agreement, documents executed in connection with this Agreement, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Debtor under this Agreement, after Debtor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

    8.    **GENERAL.** The waiver by Secured Party of any breach of any provision of this Security Agreement or warranty or representation herein set forth will not be construed as a waiver of any subsequent breach. The failure to exercise any right hereunder by Secured Party will not operate as a waiver of such night. All rights and remedies herein provided are cumulative. Debtor may not assign its nights or delegate its duties hereunder without Secured Party's written consent. This Security Agreement may not be altered or amended except by a writing signed by all the parties hereto. Any provision hereof found to be invalid will not invalidate the remainder. All words used herein will be construed to be of such gender and number as the circumstances require. This Security Agreement binds Debtor, its successors and assigns, and inures to the benefit of Secured Party, its successors and assigns.

    9.    **CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower or any or more of them, whether now direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Borrower may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

    10.    **NOTICES.** Except for any notice required by Governmental Requirements to be given in another manner, (a) all notices required or permitted by this Security Agreement shall be in writing; (b) each notice shall be sent (i) for personal delivery by a delivery service that provides a record of the date of delivery, the individual to whom delivery was made, and the address where delivery was made; (ii) by certified United States mail, postage prepaid, return receipt requested; or (iii) by nationally recognized overnight delivery service, marked for next-business-day delivery; and (c) all notices shall be addressed to the appropriate party at its address as follows or such other addresses as may be designated by notice given in compliance with this provision:

| Lender: | Allrise Real Estate Credit Fund, LP<br>200 South Virginia Street<br>Reno, Nevada 89501 |
|---|---|
| Debtor: | FilipinoFlash, LLC<br>4195 Seville Avenue<br>Las Vegas, Nevada 89121 |

Notices will be deemed effective on the earliest of (a) actual receipt; (b) rejection of delivery; or (c) if sent by certified mail, the third day on which regular United States mail delivery service is provided

after the day of mailing or, if sent by overnight delivery service, on the next day on which such service makes next-business-day deliveries after the day of sending.

To the extent permitted by Governmental Requirements, if there is more than one Borrower, notice to any Borrower shall constitute notice to all Borrowers. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address(es).

## 11.    REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.

a.        Perfection of Security Interest. Borrower and Debtor agree to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Debtor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Debtor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender.

b.        No Violation. The execution and delivery of this Agreement will not violate any law or agreement governing Debtor or to which Debtor is a party, and its membership agreement does not prohibit any term or condition of this Security Agreement.

c.        Enforceability of Collateral. To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Debtor with or for the account debtor. So long as this Security Agreement remains in effect, Debtor shall not, without Lender's prior written consent, compromise, settle, adjust or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

d.        Location of the Collateral. Except in the ordinary course of Debtor's business, Debtor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Debtor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Debtor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Debtor's operations, including without limitation the following: (1) all real property or personal property Debtor owns or is purchasing, (2) all real property or personal property Debtor is renting or leasing, (3) all storage facilities Debtor owns, rents, leases or uses and (4) all other properties where Collateral is or may be located.

e.        Removal of the Collateral. Except in the ordinary course of Debtor's business, including the sales of inventory, Debtor shall not remove the Collateral from its existing location without Lender's prior written consent. Debtor shall, whenever requested, advise Lender of the exact location of the Collateral.

    f.  Inspection of Collateral. Lender and Lender's designated representatives and agents, including attorneys, accountants or other persons, shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

    g.  Taxes. Assessments and Liens. Debtor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Security Agreement, upon any promissory note or notes evidencing the indebtedness, or upon any of the other documents executed in connection with this Security Agreement. If the taxes, assessments or liens are not discharged within 15 days, Debtor shall deposit with Lender cash or cash equivalents in an amount adequate to provide of the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure of sale of the Collateral. In any contest Debtor shall defend itself and Lender at Debtor's sole cost and shall satisfy any final adverse judgment before enforcement against the Collateral. Debtor agrees to furnish Lender evidence that such taxes, assessments and liens have been satisfied in full and in a timely manner.

    h.  Financing Statements. Debtor authorizes Lender to file a UCC financing statement or alternatively, a copy of this Security Agreement to perfect Lender's security interest. At Lender's request, Debtor additionally agrees to sign all other documents that are necessary to perfect, protect and continue Lender's security interest in the Collateral. Debtor will pay all filing fees, title transfer fees and other fees and costs involved unless prohibited by law or unless lender is required by law to pay such fees and costs. Debtor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Security Agreement as a financing statement. If Debtor changes Debtor's name or address, or the name or address of any person granting a security interest under this Agreement changes, Debtor will promptly notify the Lender of such change.

    IN WITNESS WHEREOF, the parties have executed this Security Agreement as of the date first written above.

**DEBTOR:**

FILIPINOFLASH, LLC, A NEVADA
LIMITED LIABILITY COMPANY

_Rachel Ann Marcial Donaire, Managing_
Member

_Nonito Gonzalez Donaire Jr, Managing Member_

© 2007 Geraci Law Firm; All Rights Reserved.
Collateral Security Agreement

Rev. 05/16

**Exhibit 1-h, "Occupancy And financial Status Affidavit, dated April 12, 2018"**

Complaint for MATTHEW LOTZE and LAURA OHMAN

# OCCUPANCY AND FINANCIAL STATUS AFFIDAVIT

STATE OF NEVADA                     )
                                    ) ss:
COUNTY OF                           )

BEFORE ME, the undersigned authority duly authorized to take acknowledgments and administer oaths, personally appeared
RACHEL ANN MARCIAL DONAIRE, NONITO GONZALEZ DONAIRE JR.

(the "Borrower"),

who upon being duly sworn on oath, certified as follows:

1.  **Material Inducement:** Borrower understands and agrees that the statements contained herein are given as a material inducement to ALLRISE REAL ESTATE CREDIT FUND, LP

(the "Lender"),

and Lender is relying upon such statements, to make a mortgage loan (the "Loan") to Borrower, repayment of which is secured by a Mortgage, Deed of Trust, Security Deed or other instrument of security (the "Security Instrument") on certain real property located at 3730 TOPAZ STREET, LAS VEGAS, NEVADA 89121

(the "Property").

2.  **Occupancy:** [check one box only]

    ☐ **Principal Residence.** Borrower either currently occupies and uses the Property as Borrower's principal residence, or Borrower will occupy and use the Property as Borrower's principal residence within 60    days after Borrower signs the Security Instrument. Borrower will continue to occupy and use the Property as Borrower's principal residence for at least one (1) year from the date that Borrower first occupies the Property. However, Borrower will not have to occupy and use the Property as Borrower's principal residence within the time frames set forth above if Lender agrees in writing that Borrower does not have to do so. Lender may not refuse to agree unless the refusal is reasonable. Borrower will also not have to occupy and use the Property as Borrower's principal residence within the time frames set forth above if extenuating circumstances exist which are beyond Borrower's control.

    ☐ **Second Home.** Borrower will occupy, and will use, the Property as Borrower's second home. Borrower will keep the Property available for Borrower's exclusive use and enjoyment at all times, and will not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person any control over the occupancy or use of the Property.

    ☒ **Investment.** The Property is owned and held by Borrower as an investment property. Borrower does not now occupy or use the property, and has no present intention to occupy or use the Property in the future, either as Borrower's principal residence or second home. Borrower now occupies and uses other property or properties as Borrower's principal residence and/or second home.

3.  **Financial Status:** Borrower understands that Lender is making the Loan based upon statements and representations contained in, or made in connection with, the residential mortgage loan application given by Borrower to Lender (the "Loan Application"). Borrower hereby certifies that the information provided by Borrower contained in, or made in connection with, the Loan Application related to Borrower's financial status (such as Borrower's employment, income, available cash, debts, expenses, credit obligations, and the like), has not changed significantly and that the such information accurately reflects Borrower's current financial status. Borrower certifies further that Borrower has not received a layoff notice or otherwise have knowledge of a pending layoff, and Borrower, to the best of Borrower's knowledge and belief, is unaware of any events or circumstances in the foreseeable future that would impair or have an

Ofsa.msc.xml

adverse effect on Borrower's ability to fulfill Borrower's Loan obligations, including, but not limited to Borrower's obligation to make required periodic payments.

4. **False, Misleading or Inaccurate Statements:** Borrower understands that Borrower will be in default under the terms of the Security Instrument if, during the application process for the Loan, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan, including, but not limited to, representations concerning Borrower's occupancy of the Property and Borrower's financial status. Borrower understands further that any intentional or negligent misrepresentation(s) of the information contained in, or made in connection with, the Loan Application may result in severe civil and/or criminal penalties, including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq. and liability for monetary damages to the Lender, its agents, successors and assigns, insurers and any other person who may suffer any loss due to reliance upon any misrepresentation(s) which Borrower has made on or in connection with the Loan Application.

FILIPINO FLASH LLC, A NEVADA LIMITED LIABILITY COMPANY

By: _____  4/12/18
Borrower RACHEL ANN MARCIAL DONAIRE,  Date
MEMBER

By: _____  4/12/18
Borrower NONITO GONZALEZ DONAIRE JR.,  Date
MEMBER

Borrower _____  Date

Borrower _____  Date

Borrower _____  Date

Borrower _____  Date

Subscribed and sworn to before me this          day of

_____
(Notary Public)

*(Notary Seal)*

OCCUPANCY AND FINANCIAL STATUS AFFIDAVIT
OFSA.MSC 05/03/17                                   Page 2 of 2

DocMagic *eForms*
www.docmagic.com

OFSA.MSC.xml

# Exhibit 1-i, "Federal Truth-In-Lending Disclosure Statement, dated April 12, 2018"

Complaint for MATTHEW LOTZE and LAURA OHMAN

# FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Loan Number: 18-5078

Date: APRIL 12, 2018

Creditor: ALLRISE REAL ESTATE CREDIT FUND, LP

Address: 200 S VIRGINIA ST. STE 500, RENO, NEVADA 89501

Borrower(s): FILIPINO FLASH LLC, A NEVADA LIMITED LIABILITY COMPANY

Address: 4195 SEVILLE AVENUE, LAS VEGAS, NEVADA 89121

Disclosures marked with an "x" are applicable:

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. | ☐ Total Sale Price<br>The total cost of your purchase on credit including your down-payment of $ |
|---|---|---|---|---|
| 20.712 % | $295,562.50 | $1,369,287.50 | $1,664,850.00 | $ N/A |

## INTEREST RATE AND PAYMENT SUMMARY

| | INTRODUCTORY<br>Rate & Monthly Payment<br>(for first 11 months) | FIRST INCREASE<br>05/01/19 |
|---|---|---|
| Interest Rate | 10.990 % | 10.990 % |
| Principal Payment | - none - | $ 1,500,000.00 |
| Interest Payment | $ 13,737.50 | $ 13,737.50 |
| ☐ Est. Taxes + Insurance (Escrow)<br>　☐ Includes Mortgage Insurance | $ N/A | $ N/A |
| Total Est. Monthly Payment | $ 13,737.50 | $ 1,513,737.50 |

**There is no guarantee that you will be able to refinance to lower your rate and payments.**

☐ **DEMAND FEATURE:** This obligation has a demand feature.
☐ **VARIABLE RATE FEATURE:** Your loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
MODEL FORM H-4(H)
TILFIOL.DSC 03/03/15

Page 1 of 2

DocMagic *eForms*
www.docmagic.com



Tilfiol.dsc.xml

# Exhibit 1-j "Borrower's Certification And Authorization, dated April 12, 2018"

Complaint for MATTHEW LOTZE and LAURA OHMAN

Loan Number: 18-5078

# BORROWER'S CERTIFICATION AND AUTHORIZATION

## CERTIFICATION

The undersigned certify the following:

1.  I/We have applied for a mortgage loan from ALLRISE REAL ESTATE CREDIT FUND, LP

("Lender").

In applying for the loan, I/we completed a loan application containing information on the purpose of the loan, the amount and source of the downpayment, employment and income information, and assets and liabilities. I/We certify that all of the information is true and complete. I/We made no misrepresentations in the loan application or other documents, nor did I/we omit any pertinent information.

2.  I/We understand and agree that Lender reserves the right to change the mortgage loan review process. This may include verifying the information provided on the application.

3.  I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements when applying for this mortgage, as applicable under the provisions of Title 18, United States Code, Section 1014.

## AUTHORIZATION TO RELEASE INFORMATION

To Whom It May Concern:

1.  I/We have applied for a mortgage loan from Lender. As part of the application process, Lender and the mortgage guaranty insurer (if any), may verify information contained in my/our loan application and in other documents required in connection with the loan, either before the loan is closed or as part of its quality control program.

2.  I/We authorize you to provide to Lender and to any investor to whom you may sell my mortgage, and to the mortgage guaranty insurer (if any), any and all information and documentation that they request for a period not in excess of three months from the date of my/our execution of this Authorization to Release Information. Such information includes, but is not limited to, employment history and income; bank, money market, and similar account balances; credit history; and copies of income tax returns.

3.  I/We further authorize Lender to order a consumer credit report and verify other credit information.

4.  Lender or any investor that purchases the mortgage, or the mortgage guaranty insurer (if any), may address this authorization to any party named in the loan application. A copy of this authorization may be accepted as an original.

5.  Your prompt reply to Lender, the investor that purchased the mortgage, or the mortgage guaranty insurer (if any) is appreciated. The mortgage guaranty insurer (if any) is: N/A

FILIPINO CASH LLC, A NEVADA LIMITED LIABILITY COMPANY

By: _____   4/12/18
Borrower   RACHEL ANN MARCIAL   Date        Social Security Number
DONAIRE, MEMBER

By: _____   4/12/18
Borrower   NONITO GONZALEZ DONAIRE JR.   Date        Social Security Number
MEMBER

Borrower _____   Date _____   Social Security Number _____

Borrower _____   Date _____   Social Security Number _____

Borrower _____   Date _____   Social Security Number _____

Borrower _____   Date _____   Social Security Number _____

DocMagic eForms
www.docmagic.com

Tdc.lsr.xml

**Exhibit 1-k, "Itemization of Amount Financed, dated April 12, 2018"**

Complaint for MATTHEW LOTZE and LAURA OHMAN

Lender: ALLRISE REAL ESTATE CREDIT FUND, LP
      200 S VIRGINIA ST. STE 500
      RENO, NEVADA 89501
Borrower(s): FILIPINO FLASH LLC, A NEVADA LIMITED LIABILITY COMPANY
      4195 SEVILLE AVENUE
      LAS VEGAS, NEVADA 89121
Date: APRIL 12, 2018

Loan Number: 18-5078

---

# ITEMIZATION OF AMOUNT FINANCED

- **AMOUNT GIVEN TO YOU DIRECTLY**      $    266,067.33

- **AMOUNT PAID ON YOUR ACCOUNT:**
  Homeowner's Insurance Reserves
  Property Tax Reserves
  Other Reserves:

  Aggregate Adjustment

- **AMOUNT PAID TO OTHERS ON YOUR BEHALF:**
  Appraisal Fee
  Credit Report Fee
  Hazard Insurance Premium
  Document Preparation Fee  to: DEL TORO LOAN SERVICING     675.00
  Notary Fee  to: DRIGGS TITLE AGENCY, INC.     175.00
  Owner's Title Ins. Premium
  Recording Fee  to: DRIGGS TITLE AGENCY, INC.     200.00
  Title – Endorsement Fee to: DRIGGS TITLE INSURANCE, INC.     150.00
  Title – Lender's Title Insurance to: DRIGGS TITLE INSURANCE, INC.     3,010.00
  Title – Document Fee to: DRIGGS TITLE AGENCY, INC.     850.00


    PAYOFF: SEE ATTACHED SCHEDULE      1,098,110.17

  **LOAN PROCEEDS TO:**


- **AMOUNT FINANCED**      $    1,369,287.50

- **PREPAID FINANCE CHARGE**      $    130,712.50

- **LOAN AMOUNT**      $    1,500,000.00

ITEMIZATION OF AMOUNT FINANCED
12 CFR 1026.18(c)
IAFL.TIL 08/11/14       Page 1 of 2       DocMagic *eForms*
www.docmagic.com

Iafl.til.xml

## ITEMIZATION OF PREPAID FINANCE CHARGE

| | | |
|---|---|---:|
| Loan Origination Fee | to: ROYAL DEVELOPMENT, INC. | 48,750.00 |
| Loan Discount Fee | | |
| Tax Service Fee | | |
| Prepaid Interest ( 18 days) | | |
| @ 10.990 % per annum | | 8,242.50 |
| Mtge. Ins. Premium | | |
| Mtge. Ins. Reserves | | |
| Origination Fee  to: Broker Affiliate | | 15,000.00 |
| Processing Fee to: ROYAL DEVELOPMENT, INC. | | 750.00 |
| Underwriting Fee to: ROYAL DEVELOPMENT, INC. | | 1,995.00 |
| Title – Closing Protection Letter Fee to: DRIGGS TITLE INSURANCE, INC. | | 25.00 |
| Title – Settlement Agent Fee to: DRIGGS TITLE AGENCY, INC. | | 1,000.00 |
| 4 Months Interest Reserve Payments to: DEL TORO LOAN SERVICING | | 54,950.00 |

**TOTAL PREPAID FINANCE CHARGE**          $      130,712.50

---

The undersigned acknowledge receiving and reading a completed copy of this disclosure.

FILIPINO FLASH LLC, A NEVADA LIMITED LIABILITY COMPANY

By: _[signature]_  4/12/18          By: _[signature]_  4/12/18

Borrower RACHEL ANN MARCIAL DONAIRE,     Date          Borrower NONITO GONZALES DONAIRE JR.,     Date
MEMBER                                                                              MEMBER

Borrower _____ Date          Borrower _____ Date

Borrower _____ Date          Borrower _____ Date

ITEMIZATION OF AMOUNT FINANCED
12 CFR 1026.18(c)
IAFL.TIL 08/11/14                    Page 2 of 2

DocMagic eForms
www.docmagic.com

Iafl.til.xml

# PAYOFF SCHEDULE

**Loan No.:** 18-5078

**Borrower(s):** FILIPINO FLASH LLC, A NEVADA LIMITED LIABILITY COMPANY

The following accounts <u>must</u> be paid off through escrow as a condition of the attached loan approval:

| | |
|---|---:|
| FIRST COMMERCE | 785,071.74 |
| JASON MATTSON | 162,038.30 |
| WATER TO CLARK COUNTY WATER RECLAMATION DISTRICT | 259.20 |
| TRASH TO REPUBLIC SERVICES | 90.93 |
| INVOICES FOR TO A1 LAWN | 20,000.00 |
| INVOICE FOR THREE J'S HANDYMAN, LLC | 17,150.00 |
| INVOICE TO AM CABINETS | 3,500.00 |
| PAYOFF TO ICG ENTERPRISES, LLC | 110,000.00 |

TOTAL:                                                                 1,098,110.17

By: _____
RACHEL ANN MARCIAL DONAIRE, MEMBER

By: _____
NONITO GONZALEZ DONAIRE JR.,
MEMBER

DocMagic eForms
www.docmagic.com

laf1.til.xml



"Premier Services *for the* Private Lending Professional"

DEL TORO LOAN SERVICING, INC.
2300 Boswell Road Ste 215 Chula Vista, CA 91914

Date: April 12, 2018
To:   Lorraine Velko, Escrow Officer – Driggs Title Agency
File:   Escrow Number & Title Order Number 18-02-113371LV
Property Address: 3730 Topaz Street, Las Vegas, NV 89121
Borrower: Filipino Flash, LLC     Loan Number: 18-5078

## Closing Instructions To Title and Escrow

A. Upon closing please provide Borrower a copy of all loan documents and return ALL original loan docs to:
   Roval Development, Inc., 200 South Virginia Street, Suite 500, Reno, NV 89501 and email executed copies to
Katherine@deltoromail.com and Christine@deltoromail.com and Crystal@allrisefinancialgroup.com

B. Borrower to pay all closing costs, including, but not limited to escrow and title fees, which are to be deducted from the loan proceeds.

C. Taxes are to be paid current and shall be paid through escrow.

D. The following amounts are to be made payable to Del Toro Loan Servicing, Inc. and delivered to:
   2300 Boswell Rd Ste. 215 Chula Vista, CA 91914

        Interest Reserves $54,950.00
        Doc Prep Fee      $    675.00
                          $55,625.00

E. Interest should be paid from date of funding to 5/1/2018 at $457.9167 per diem and delivered to:
   Del Toro Loan Servicing, Inc. 2300 Boswell Rd Ste 215 Chula Vista, CA 91914

F. The following Fee is to be made payable to Roval Development, Inc. and delivered via courier or overnight delivery to:
   200 South Virginia Street, Suite 500, Reno, NV 89501

        Loan Origination Fee    $48,750.00
        Underwriting Fee        $ 1,995.00
        Processing Fee          $ 750.00
                                $51,495.00

G. The following Fee is to be made payable to American Pacific Mortgage at 1495 Ridgeview Drive #200, Reno, NV 89519

        Broker Fee $15,000

H. You have authorization to close this transaction when you hold for us the following:
   1.  Recorded Deed of Trust in 1st position on subject property
   2.  ALTA Lender's Title Policy on subject properties for $1,875,000.00 (125% of the principal balance)
   3.  Insurance must be current and in place naming:Allrise Real Estate Credit Fund, LP , ISAOA as 1st Mortgagee
   4.  The title policy must be clear of all judgments, liens, past due taxes and attachments
   5.  Closing Protection Letter
   6.  A completed Business Purpose of Loan Certification in borrower's own handwriting
   7.  Certified Final HUD-1 (initial all pages) and email confirmation of recording and the final HUD-1
   from this closing to Katherine@deltoromail.com and christine@deltoromail.com and
Crystal@allrisefinancialgroup.com

*We will need these instructions returned executed by all parties prior to funding.*
*It is acceptable if they are signed in counter part.*

1    **Exhibit "2", the "Deed of Trust, dated 4/12/2018"**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for MATTHEW LOTZE and LAURA OHMAN

Assessor's Parcel Number:
162-13-301-024
Recording Requested By:
DRIGGS TITLE AGENCY

And When Recorded Return To:
ROYAL DEVELOPMENT INC.
200 S VIRGINIA ST. STE 500
RENO, NEVADA 89501
Loan Number: 18-5078

Mail Tax Statements To:
RACHEL ANN MARCIAL DONAIRE
4195 SEVILLE AVENUE
LAS VEGAS, NEVADA 89121

Mortgage Broker's Name: AMERICAN PACIFIC
MORTGAGE
NV License #: 1850

——————————————[Space Above This Line For Recording Data]——————————————

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   APRIL 12, 2018          , together with all Riders to this document.
(B) "Borrower" is FILIPINO FLASH LLC, A NEVADA LIMITED LIABILITY COMPANY

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029 1/01                         Page 1 of 15

DocMagic *eForms*
www.docmagic.com

Nv3029.die.xml

Borrower is the trustor under this Security instrument.
(C) **"Lender"** is ALLRISE REAL ESTATE CREDIT FUND, LP

Lender is a                                                                                                            organized
and existing under the laws of NEVADA
Lender's address is 200 S VIRGINIA ST. STE 500, RENO, NEVADA 89501

Lender is the beneficiary under this Security Instrument.
(D) **"Trustee"** is DEL TORO LOAN SERVICING, INC.
PO BOX 211000, CHULA VISTA, CALIFORNIA 91921

(E) **"Note"** means the promissory note signed by Borrower and dated APRIL 12, 2018
The Note states that Borrower owes Lender ONE MILLION FIVE HUNDRED THOUSAND AND 00/100
                                                                    Dollars (U.S. $ 1,500,000.00          )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not
later than MAY 1, 2019
(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due
under the Note, and all sums due under this Security Instrument, plus interest.
(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders
are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Planned Unit Development Rider |
| ☒ Balloon Rider | ☐ Biweekly Payment Rider |
| ☒ 1-4 Family Rider | ☐ Second Home Rider |
| ☐ Condominium Rider | ☐ Other(s) [specify] |

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances
and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable
judicial opinions.
(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners association or
similar organization.
(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions,
transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) **"Escrow Items"** means those items that are described in Section 3.
(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any
third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to,
or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii)

conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| COUNTY | of | CLARK | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".

which currently has the address of                                    3730 TOPAZ STREET
                                                                                      [Street]

          LAS VEGAS          , Nevada          89121                    ("Property Address"):
          [City]                               [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029 1/01                              Page 3 of 15

DocMagic *e*Forms
www.docmagic.com

NV3029.det.xml

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029  1/01                          Page 4 of 15

DocMagic *eForms*
www.docmagic.com

by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029  1/01                              Page 5 of 15

DocMagic *eForms*
www.docmagic.com

lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029  1/01                    Page 6 of 15

DocMagic *ᴇ*Forms
www.docmagic.com

Nv3029.dot.xml

lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029 1/01                    Page 7 of 15

DocMagic *EForms*
www.docmagic.com

Nv3029.dot.xml

Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029 1/01                    Page 8 of 15

DocMagic *EFannie*
www.docmagic.com

Nv3029.dot.xml

takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029  1/01                         Page 9 of 15

DocMagic *eForms*
www.docmagic.com

NV3029.dot.xml

Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029  1/01                                    Page 10 of 15

DocMagic *eFarms*
www.docmagic.com

Nv3029.dot.xml

given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029 1/01                    Page 11 of 15

DocMagic *EForms*
www.docmagic.com

Nv3029.dot.xml

Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20.  Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21.  Hazardous Substances.**  As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029  1/01                              Page 12 of 15

DocMagic *€Forms*
www.docmagic.com

Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

   NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:
   22. Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.  If the default is not cured on or before the date specified in the notice, Lender at its option, and without further demand, may invoke the power of sale, including the right to accelerate full payment of the Note, and any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.
   If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute written notice of the occurrence of an event of default and of Lenders' election to cause the Property to be sold, and shall cause such notice to be recorded in each county in which any part of the Property is located.  Lender shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the persons prescribed by Applicable Law.  Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law.  After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines.  Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale.  Lender or its designee may purchase the Property at any sale.
   Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied.  The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein.  Trustee shall apply the proceeds of the sale in the following order:  (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.
   23. Reconveyance.  Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee.  Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it.  Such person or persons shall pay any recordation costs.  Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.
   24. Substitute Trustee.  Lender at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder.  Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029  1/01                                Page 13 of 15

DocMagic *eFarms*
www.docmagic.com

**25. Assumption Fee.** If there is an assumption of this loan, Lender may charge an assumption fee of U.S. $ one percent (1%) of the unpaid principal balance, but not less than $400 or more than $900.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

FILIPINO FLASH LLC, A NEVADA LIMITED LIABILITY COMPANY

_____ (Seal)
By: RACHEL ANN MARCIAL DONAIRE,       -Borrower
MEMBER

By: _____ (Seal)
NONITO GONZALEZ DONAIRE               -Borrower
JR., MEMBER

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

Witness:                        Witness:

_____   _____

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029  1/01                    Page 14 of 15

DocMagic *eForms*
www.docmagic.com

Nv3029.did.xml

_____ [Space Below This Line For Acknowledgment] _____

State of   NEVADA

County of   Clark

This instrument was acknowledged before me on   April 12 2018

(date)

by   RACHEL ANN MARCIAL DONAIRE AND NONITO GONZALEZ DONAIRE JR.

_____

(name(s) of person(s))

Signature of notarial officer

I Velko    Notary

Title and Rank

(Seal, if any)                    My commission expires:   7-15-18

NEVADA--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3029  1/01                    Page 15 of 15

DocMagic eForms
www.docmagic.com

Nv3029.dsx.xml

APN: 162-13-301-024

## Exhibit "A"

THE NORTHEAST QUATER (NE 1/4) OF THE NORTHEAST QUARTER (NE 1/4) OF THE NORTHWEST QUARTER (NW 1/4) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 13, TOWNSHIP 21 SOUTH, RANGE 61 EAST, M.D.B. AND M., CLARK COUNTY, NEVADA.

EXCEPTING THEREFROM THE NORTH FORTY FEET (40.00') AND THE WEST THIRTY FEET (30.00') AND THE EAST THIRTY FEET (30.00') TOGETHER WITH A SPANDREL AREA IN THE NORTHWEST COMER (NW COR) THEREOF, ALSO BEING THE SOUTHEAST CORNER (SE CUR) OF THE INTERSECTION OF PACIFIC STREET AND TWAIN AVENUE, BOUNDED AS FOLLOWS:

ON THE NORTH BY THE SOUTH LINE OF THE NORTH FORTY FEET (40.00') THEREOF; ON THE WEST BY THE EAST LINE OF THE WEST THIRTY FEET (30.00') THEREOF; AND ON THE SOUTHEAST BY THE ARC OF THE CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF TWENTY FEET (20.00'} AND BEING TANGENT TO THE SOUTH LINE OF THE NORTH FORTY FEET (40.00') AND TANGENT TO THE EAST LINE OF THE WEST THIRTY FEET (30.00'); TOGETHER WITH A SPANDRES AREA IN THE NORTHEAST COMER (NE CUR} THEREOF, BEING THE SOUTHWEST CORNER (SW COR) OF THE INTERSECTION OF TWAIN AVENUE AND TOPAZ STREET, BOUNDED AS FOLLOWS:

ON THE EAST BY THE WEST LINE OF THE EAST THIRTY FEET (30.00'} THEREOF;

ON THE NORTH BY THE SOUTH LINE OF THE NORTH FORTY FEET (40.00") THEREOF; AND ON· THE SOUTHWEST BY THE ARC OF A CURVE CONCAVE SOUTHWESTERLY, HAVING A RADIUS OF TWENTY FEET (20.00') AND BEING TANGENT TO THE WEST LINE OF THE EAST THIRTY FEET (30.00'} AND TANGENT TO THE SOUTH LINE OF THE NORTH FORTY FEET (40.00') BY DEED RECORDED NOVEMBER 12, 1985 IN BOOK 2215 AS DOCUMENT NO. 2174460 OF OFFICIAL RECORDS.

ALSO DESCRIBED AS PARCEL ONE (1} OF THE CERTIFICATE OF LAND DIVISION RECORDED APRIL 25, 1986 IN BOOK 860425 AS DOCUMENT NO.'00956, OFFICIAL RECORDS.

TOGETHER WITH THAT PORTION OF VACATED TOPAZ STREET AS SHOWN ON ORDER OF VACATION RECORDED NOVEMBER 3, 1999 IN BOOK 991103 AS DOCUMENT NO. 01199 AND RE-RECORDED MARCH 24, 2000 IN BOOK 20000324 AS DOCUMENT NO. 00369, OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

STATE OF NEVADA
DECLARATION OF VALUE FORM

1. Assessor Parcel Number(s)
   a. 162-13-301-024
   b._____
   c._____
   d._____

2. Type of Property:
   a. ☐ Vacant Land     b. ☑ Single Fam. Res.
   c. ☐ Condo/Twnhse    d. ☐ 2-4 Plex
   e. ☐ Apt. Bldg       f. ☐ Comm'l/Ind'l
   g. ☐ Agricultural    h. ☐ Mobile Home
      ☐ Other_____

   | FOR RECORDER'S OPTIONAL USE ONLY |
   | Book:_____ Page:_____ |
   | Date of Recording:_____ |
   | Notes: |

3. a. Total Value/Sales Price of Property          $ 0.00 _____
   b. Deed in Lieu of Foreclosure Only (value of property)  (_____)
   c. Transfer Tax Value:                           $ 0.00
   d. Real Property Transfer Tax Due                $ 0.00

4. **If Exemption Claimed:**
   a. Transfer Tax Exemption per NRS 375.090, Section 9
   b. Explain Reason for Exemption: transfering to LLC without consideration
   _____

5. Partial Interest: Percentage being transferred: 100.00 %

   The undersigned declares and acknowledges, under penalty of perjury, pursuant to NRS 375.060 and NRS 375.110, that the information provided is correct to the best of their information and belief, and can be supported by documentation if called upon to substantiate the information provided herein.  Furthermore, the parties agree that disallowance of any claimed exemption, or other determination of additional tax due, may result in a penalty of 10% of the tax due plus interest at 1% per month.  Pursuant to NRS 375.030, the Buyer and Seller shall be jointly and severally liable for any additional amount owed.

Signature_____      Capacity Agent
Signature_____      Capacity Agent

**SELLER (GRANTOR) INFORMATION**          **BUYER (GRANTEE) INFORMATION**
**(REQUIRED)**                            **(REQUIRED)**
Print Name: Nonito G. Donaire, JR & Rachel M. Don ✱   Print Name: Filipino Flash, LLC, a Nevada LLC
Address: 2550 E Desert Inn Rd #188        Address: 2550 E. Desert Inn Rd. #188
City: Las Vegas                           City: Las Vegas
State: NV        Zip: 89121               State: NV        Zip: 89121
✱ aire                                    ✱ Filipino Flash.

**COMPANY/PERSON REQUESTING RECORDING (required if not seller or buyer)**
Print Name: Driggs Title Agency           Escrow #: 18-02-113371LV
Address: 7900 West Sahara Avenue Suite 150
City: Las Vegas                           State: NV        Zip: 89131

**AS A PUBLIC RECORD THIS FORM MAY BE RECORDED/MICROFILMED**